Anthony Lutie for the Appellants, Your Honors. And good morning. Please escort him in. This is a situation where a man was in his house. Police officers came to his house to ostensibly search for someone else or were worried that someone else was going to commit suicide, which was not a crime. And he ended up on his front yard the first time, patted down and searched. What difference does it make whether it's a crime or not? Well, it makes a difference for the emergency doctrine that they're trying to utilize, whether or not there was consent to search his house, Your Honor. There were no exigent circumstances for them to believe that a crime was being committed. Well, they were there serving the public, weren't they? They were there serving the public, yes. And they get a call that this woman lives, rents a room in this house and that a friend thought she was going to commit suicide and was quite frantic about it. And so, you know, it's kind of exigent, isn't it? And what are they supposed to do, go get a search warrant and spend another hour and then go in that way? I mean, it's a big emergency. That's understandable, Your Honor. Yeah. So they go in. They knock on the door. Yes. He didn't want to let them in. He says he's a police officer from the LAPD. Yes, Your Honor. And he's out on the balcony in the skivvy drawers. Yes. And all right. So... That's absolutely right, Your Honor. The first time. That was justified until they knew that the lady wasn't in the house. And even if that was justified, a warrantless search without his consent for the first time, they came in three times. One of the times they're not even going to dispute was to get some keys. That's not exigent circumstances. That's not an emergency. They had no reason for doing that. And they went in anyway. The second time, that's the third time, the second time they went in, there was another police officer there that was a supervisor that advised them that she was there and she was fine. Now, there is a disputed fact as to whether she was okay or, as they're saying, she was laid in a fetal position. Either way, they still were not permitted to go in by this person, and they did not have to go in by this person. And that's two of the searches. Maybe they had emergencies for the first one. There was no justification for patting him down and detaining him. Well, wait. Now, this man, this plaintiff that you represent is a policeman who is what, lives outside of the city of L.A., I get the picture. Am I right? Yes, Your Honor. In the county. Yes, Your Honor. And the county has reason to come to his home, and he immediately, I take it early on, identifies himself as a policeman, right? Yes, Your Honor. And he says to his colleagues, who are likewise policemen, you cannot come in my house in spite of this report that you have about a woman committing suicide. They know he's a policeman, right? Yes, Your Honor. Before they ever touch him. Yes, Your Honor. Now, would you say that if you have a policeman that is behaving the way your client did, that there would be more reason for another policeman to be concerned that he might be armed than if he's a lawyer? Your Honor, if he was detained long enough. Now, my question is, is there more reason to believe that this person would be armed because he is a policeman as opposed to being a lawyer or some other non-policeman? There's one other fact. This was a policeman in Skivvies, Your Honor. No. Is it more likely that he would be armed than a lawyer? Yes, Your Honor. Okay. But he was wearing his jeans at the time he was searched. Yes, Your Honor. And that's all he was wearing was his jeans when he was searched. They could have conducted a pat-down. It is disputed as to whether they say he was held, detained as they have admitted. He was detained for a few minutes or 40 to 50 minutes while they conducted the search. Well, he was detained for a few minutes. The whole episode from beginning to end lasted 40 to 50 minutes. Yes. The initial incident where he was pat down, the pat-down search, where they came in and left was just a few minutes, whatever that means. They patted him down and then they held him there while they searched his house. He was still detained outside. He asked for permission to go in to put on a shirt and all of that, and they didn't allow him to do that. Now, I will, for the purposes of argument, concede that if... Isn't it a little odd that, I mean, here you have a policeman and he's a lawyer. And two deputy sheriffs show up, and they get this information, which they consider to be reliable, that there's a woman who lives in this house who is suicidal and may commit suicide. And isn't it kind of odd that he wouldn't say, well, or he wouldn't say, well, how are you? You know, I'm a policeman, too, and I understand your job and everything's fine. Come on in, take a look. I mean, well, he didn't want him to go in. It's kind of strange, isn't it? Well, then wouldn't you worry a little bit about, if you were a policeman, wouldn't you worry a little bit about this other police officer who won't let you go in? And, you know, check things out for yourself. That's your job. And also, he was renting a room to a woman that wasn't his wife, was it? He was renting a room to a woman that was a friend of his fiancée, Your Honor. But the police didn't know any of that. They didn't know any of that. I mean, you've got a single woman and here's a guy who's got a house. He rents a room to her, and who knows what was going on. I mean, you think of a lot of things. I'm sure this ran through their minds, and then he says, you can't come in the house. So they worry about him. The first time. Then they came back, and they came back when his supervisor was there. And his supervisor, another police officer, said, everything's okay, they're in the house. In fact, you can come and talk to her, she's here. He didn't want them to come in without him present. Did the other supervisor really say, everything's okay, or did he just say, she's in the house? She's in the house. I have spoken to her, if you want to come back. And another thing I want to point out, with respect to his activities, these police officers were asked if his activities rose to the level where he was so belligerent that it would be police misconduct. They said no. And while you're focusing on the first search, there is a second search, which he did not give them permission for. And yet a third search, which he did not give them permission for, where they didn't even have anything. I forgot my keys. I'm coming in your house to get my keys. He says no. They still went in the house. They still searched the house. There were three searches here, and that is the problem with the summary judgment. Why didn't he say no after the second search? Why didn't he just say, oh, she's here, come on in? It belittled, Your Honor. I mean, he said. It was a matter of pride. Yeah, it may have been a matter of pride, regardless of what his motivation was. They knew after the second search that there was no accident or emergency. After the second search. After the second search. Because they took her with them after the second search. Exactly. And they came in. They came in again after the second search. There is a dispute as to whether they even knew he was okay after the first search. When they came back to the house, they knew that he was there with yet another police officer, and she was there. They knew that there wasn't an emergency search where they had to burst in under those circumstances. We're talking about three searches. If it was one, Your Honor, Your Honor Preggison, if it was just one, I would agree with you completely. But they came in three times trampling upon his rights. Three times. If the police came to my house once because they thought there was an emergency, that's okay. When they find out there's not an emergency and they leave, and then they come back again when there's no emergency and come into my house, that may be a problem. When they turn around the third time and walk into my house and say I'm trampling through your house, your private place, for my keys, that is a violation of our rights. They needed to show some sort of consent and just to do a blanket granting a summary judgment saying that it's undisputed. They had their patrol car outside, right? Yes, Your Honor. They had weapons in there probably, huh? And they couldn't get the thing going. What if there was another emergency that came over the radio? No, I have the keys. And in fact, he used another officer's spare keys to drive away. Second of all, he found the keys later on in his car. They were never even in there. He had no reason to go in there. But it's not abnormal to lose your keys. No, but it is abnormal. I agree, Your Honor. I agree, but it is abnormal for the police to say I've lost my keys, I'm coming in your house, whether you want me to or not. This is bigger than just this man that might have been belligerent. I want to clear up a couple of things for the record. First of all, in your brief, you make a reference to the statute of limitations. There's no statute of limitations issue. No, no, Your Honor. That's a mistake. Yes, Your Honor, that was. And then you say that the trial court granted the appellee's motion for summary judgment on all claims. That's true, is it not? That is true, Your Honor. And so the portion of your brief dealing with the question of whether or not there was an abuse of discretion in failing to exercise supplemental jurisdiction is beside the point, is it not? It is. This case, according to the record, has been adjudicated on all claims. Yes, Your Honor. The reason I put that in is in an abundance of caution. I didn't know. All right. All right. But we understand each other that you say it's all claims, and that's the way I read the record, too. That's correct, Your Honor. And then you make an assertion in here that the trial court made several erroneous factual findings. There are no factual findings in this case. This is pure summary judgment, or did the court undertake to make some factual findings? No, Your Honor. It just adopted all of the undisputed facts, and it said I'm basing my decision based on the undisputed facts. Okay. So we don't have to worry about the court going beyond the motion for summary judgment and making any findings of that? No. We do not have to worry about that. That's all I have. I just had one thing we're about done, but you can see that the officer's conduct is judged based on the facts as they understand them, stood them at the moment, as opposed to the benefit of hindsight? Yes, Your Honor, for all three searches. Right. As they understood them as things were developing. As they understood them, Your Honor, for all three searches. Okay. And I guess my time's been up, so I'll just... Thank you. Thank you. All right. You're a good advocate. Let's hear from the county sheriff's department. Good morning, Your Honors. Gilbert Nishimura representing the appellees, County of Los Angeles, the sheriff's department, Deputy Tony Hackett, Deputy Dean Camarillo, and Sergeant Jennifer Bateman. I would like to say that I've been practicing for about 30 years, Your Honor. This is my very first opportunity to appear in this court. I hope the court will be patient with me and perhaps compassionate. We're always patient and compassionate. Never compassionate. I would like to reiterate that this is a case of sheriff's deputies responding reasonably to an emergency situation. I'd like to go over the facts just very briefly because I think the facts are important. Kim Colbert calls 911, and she provides her name and her phone number and says that she was talking to her girlfriend, who was very upset, was talking about suicide. In the middle of the conversation, she begins to cry, says she's very sorry, and hangs up. Kim Colbert tries to return the call on the cell phone. There's no response. So as a good friend and a concerned friend, she calls 911 and asks if somebody can go to the house. She provides the resident address of Ms. Nelson and asks if somebody can go over there and check on her because she's very concerned that she's suicidal, that she's attempted suicide in the past by the use of pills. This is dispatched to radio units. Within minutes, we have deputies arrive at this residence. They knock on the front door. They call out her name. There's no response. So this is some concern to them. They go to the backyard. They call out her name. This gentleman, half-dressed, appears on the balcony of the second floor. The deputies identify themselves. They ask this gentleman to meet them at the front door. After a short delay, he does meet them at the front door. He identifies himself as the owner of the residence and that he is an LAPD officer. He is advised that the deputies would like to come into the house to check on the He says that that's not necessary, that he has looked for her earlier and she's not in the house and that her car is not outside parked in the front. They advise the appellant that they appreciate that, but they still need to go inside the house for themselves to check on the welfare of Ms. Nelson, and he says he's not providing consent and he's becoming very agitated. One deputy then holds his hands behind his back and does a very brief pat-down on the outer clothing of the appellant. There is a concern that this is an LAPD officer and there's a concern about the whereabouts of his service revolver. They then advise the appellant that they're going to go inside and check on the welfare. They ask him to step aside about 20 feet from the front of the door. He's standing there next to the sergeant and another deputy. Two deputies go in and they're in there for a few minutes. And these are facts that are actually stipulated by the parties in a final pretrial order signed by counsel, signed by the judge. The deputies go inside the house and they confirm that she is not present in the house. To avoid an escalation of the incident, they decide to leave. They advise the appellant that if Ms. Nelson returns, he should call the deputies. He then requests that the deputies call his station to report that outside law enforcement have come to the residence of a police officer. So we do that and we're asked if the appellant was cooperative and we say he was not cooperative, he was very uncooperative. And we're asked whether we want to file a complaint against the appellant and we say no. We didn't think it rose to that level. The appellant also calls his station and reports the incident. And he's advised that if Ms. Nelson returns, he should call the deputies. And a sergeant from the LAPD is sent over to the house to make sure he's okay. So that was the first incident. When the sergeant comes to the house, the sergeant from the LAPD, he and the appellant are talking outside and Ms. Nelson arrives and goes into the house. The appellant calls out to her, are you okay, is everything okay? She says I'm fine and she walks into the house. Sergeant Roberts of the LAPD never had a conversation with Ms. Nelson. The appellant asks Sergeant Roberts to call the sheriff's department. He does so. He says Ms. Nelson has returned to the house. Can you send over some deputies? So we respond again. We still are in the belief that there is a potential suicide situation. There's no reason for us to believe that that's not the case. When we arrive, we again ask the appellant if we can enter the residence to check on the welfare. He says only if I accompany you. And again, because of officer safety and security reasons, we decline. We say no, we need to go in ourselves to check on the safety of Ms. Nelson. Sergeant Roberts of the LAPD then forges a compromise. He says to the deputies if you allow the appellant to enter with us, I will accompany him at all times. The deputies accept that. So on the second occasion, they all go into the residence. They find Ms. Nelson in her bedroom, curled up in a fetal position, crying. And those are stipulated facts. She is interviewed. She says she's upset about the stresses of her life. She agrees to be taken to a hospital under Welfare and Institutions Code 5150 for a voluntary evaluation. Deputy Camarillo then takes her outside. They get into his patrol car. He cannot find his keys. He goes back inside, followed by the appellant, to look for his keys. This is the third entry that they're talking about. This is not a third entry. This is all part of the second visit to the house. We have not left the scene yet. All the deputies are still there. The potential suicidal victim is still there. We go in the house for a few minutes. We can't find her keys. We're able to get a substitute key from one of the other deputies, and we drive off, and we take her to the hospital. That's the case. This third entry is really, it's nothing. It's part of the second visit where the victim was located and was being taken to the hospital. Now, the Fourth Amendment clearly does not prohibit law enforcement officers from a warrantless entry and search if they believe there's an emergency situation, and that's exactly what we had here. Cervantes has a three-pronged test. We fit each of the three prongs, the first prong being that we should have some kind of a reasonable belief that there is an emergency. Clearly, the 911 call stated a potential emergency suicide. The second prong of Cervantes is that this should not be for the purpose of an arrest or obtaining evidence, and that was not the case here. We were going in in our community caretaking responsibilities. We weren't there to try to obtain evidence or arrest anybody. The third prong of Cervantes is that there should be some reasonable causation between the emergency and the location being searched. The 911 call gave us the address of this person, and the appellant acknowledged that she was a tenant. This case is disappointing and sad in a couple of levels. First of all, we have deputy sheriffs reasonably trying to do their job. They're not trying to make an arrest. They're not trying to obtain evidence. All they're trying to do is take care of their community caretaking responsibilities, trying to save somebody from serious injury or perhaps death. And the second part is that the appellant, as a police officer for the city of Los Angeles, of all people should appreciate the fact that law enforcement would need to go into the residence to check on the welfare of this lady. It's very disappointing that the appellant was so uncooperative and was so agitated about this, and we would respectfully submit that this appeal should be denied and that the summary judgment was proper in all respects. Thank you. Thank you. Any questions? No, I have no questions. Okay. Well, for a novice, you get 4-0. Okay. Very much so, and I'll be practicing for a while. Okay. Are you a novice, too? Excuse me? Is this your first visit to the Ninth Circuit? No, you've beaten me down before, Your Honor. What did you say? He said you've beaten him down before. When did I do that? I can't remember. Probably about two years ago, Your Honor. When? Two years ago. About two years ago. Your decision was right. I didn't approve. All right. Remember the name? Can I approach the podium one more time? I'm not sure if I left my keys there. Do you remember? All right. Okay. All right. Go in peace. All right.
judges: Leavy, Pregerson, Beistline